Dale Young
1314 Dillon Court
Capital Heights, Maryland
[20743]

16CV3986

IN THE DISTRICT COURT OF THE UNITED STATES FOR
THE DISTRICT OF MARYLAND

| | |
|---|---|
| Dale Young, ) | |
| Plaintiffs ) | |
| ) | |
| ) | CASE NO. |
| v. ) | |
| ) | |
| ) | |
| DITECH FINANCIAL, LLC, ) | |
| PO Box 6172 ) | |
| Rapid City, South Dakota 57709 ) | TRIAL BY JURY |
| BWW LAW GROUP, 6003 Executive Blvd,) | DEMANDED |
| Suite 101, Rockville, Maryland 20852 ) | |
| OCWEN LOAN SERVICING, LLC, ) | |
| 1661 Worthington Road, Suite 100 ) | |
| West Palm Beach, Florida 33409 ) | |
| SECURED IMPROVEMENTS, LLC ) | |
| ABDULLAH H. HIJAZI ) | |
| US BANK, NATIONAL ASSOCIATION, ) | |
| 425 Walnut Street ) | |
| Cincinnati, Ohio 45202 ) | |
| MARK RUNKEL, Executive Vice President) | |
| And Chief Credit Officer, US BANK ) | |
| P.W. PARKER, Vice Chairman And Chief ) | |
| Risk Officer, US BANKCORP, VICE ) | |
| CHAIRMAN ) | |
| DOES 1 through 15, inclusive, ) | |
| Defendants ) | |

**COMPLAINT FOR CIVIL RICO VIOLATION OF TITLE 18, US CODE, SECTIONS 1962(a), 1962(c), 1962(d)**

TO ALL PARTIES OF INTEREST:

I. STATEMENT OF THE CASE.

Complaint For Civil RICO                                  1

1. I, Dale Young, acting as our own counsel, rely upon Haines v. Kerner, 404 US 519 (1972), pursuant to the limitations imposed upon us as Petitioners and this Tribunal by the Constitution of the United States with authority and unalienable right to file a Civil RICO case pursuant to Title 18 US Code, § 1962 et seq. The Defendants also violated Title 15, US Code, Sections 1692(e) and 1692(f). Notice is hereby given that I, Dale Young, do hereby give notice to the court that the Defendants have created a racketeering enterprise, an association-in-fact, an operational enterprise that is formed from the collective actions and omissions of all of the Defendants taken together. The interaction and association and business activities of the Defendants taken together is an association-in-fact, given the planning, accounting procedures, and administrative and court actions that are required by the Defendants, and the deliberate setting aside of the legal requirements, legal notices and regulations that are required to be complied with. This civil action is related to my home located in Maryland at 1314 Dillon Court, Capital Heights, Maryland.

2. There are more than two predicate acts of racketeering activities as follows: First Predicate Act of Racketeering: **Assignment Fraud, Document Forgery;** The Assignment of the Deed of Trust was signed by Samuel Dane Strandmo an employee of Indecomm Global Services in St. Paul, Minnesota claiming to be a MERS executive, who has offices in Ramsey County, Minnesota, while mis-representing himself as a MERS executive, an Assistant Secretary see **Exhibit A**, attached and incorporated by reference. MERS has a headquarters office in Reston, Virginia and does not have an office in Ramsey County, Minnesota. The Document signer does not present any substantial credentials, such as an appointment from the MERS Board of Directors, which offers up evidence that he was appointed by MERS as an Assistant Secretary. Given the location of the signature and the proximity of Indecomm Global Services's administrative offices in St. Paul, Minnesota, this is obviously a signature by an Indecomm

Global Services employee impersonating a MERS executive. In addition, Indecomm Global Services is very close to the headquarters offices of GMAC- RFC Holding Company, LLC, a subsidiary of RESIDENTIAL FUNDING, LLC, which filed for Chapter 11 Bankruptcy in 2013, along with HOMECOMINGS FINANCIAL, LLC Consequently, the Assignment of the Deed of Trust by MERS while acting on behalf of the actual lender, HOMECOMINGS FINANCIAL, LLC is a violation of the Federal Rules of bankruptcy. This foreclosure and the recorded Assignment of Deed of Trust violated Bankruptcy Rule 2002(c)(1), 6004(a), 6006(a), 6006(b) and 6006(c) and 363(b)(2) and was done in defiance of the Federal Rules of Bankruptcy in order to defraud creditors. The assets of a bankrupt corporation cannot be sold with the permission of the bankruptcy trustee. As a result it appears that GMAC-RFC HOLDING COMPANY, LLC hired Indecomm Global Services to fabricate an assignment, where a proper chain of assignment does not exist. The document signer does not have a power of attorney from MERS or any other agency relationship authorizing the signer to act on behalf of the original lender, Homecomings Financial, LLC. Clearly this assignment was not signed by MERS and there is no Power of Attorney from the original lender granting MERS a power-of-attorney. Courts have consistently ruled that MERS lacks standing to assign mortgages and even MERS has aggressively argued in appellate court cases that they are not a mortgage lender, see *Mortgage Elec. Reg. Sys. v. Nebraska Dept. of Banking*, 270 Neb. 529, 704 N.W.2d 784 (2005), MERS challenged an administrative finding that it was a mortgage banker subject to license and registration requirements. Unless the Defendants can demonstrate that the assignor is authorized by the MERS Board of Directors to act on behalf of MERS and that the signer had regular responsibilities and duties and a salaried position with MERS then the assignment is a forgery and a sham presentation designed to hide the lack of proper chain of assignments in this case.

3. The Deed of Trust was assigned to OCWEN LOAN SERVICING, LLC, while the Note was assigned to RESIDENTIAL FUNDING, LLC and then to GMAC MORTGAGE, LLC, who was operating under a Chapter 11 bankruptcy at the time the Assignment of Deed of Trust was signed. There is not chain of title for the Deed of Trust from the original lender, Homecomings Financial, LLC to RESIDENTIAL FUNDING, LLC to GMAC MORTGAGE, LLC to OCWEN LOAN SERVICING, LLC to the current loan servicer. According to the Correspondence from the loan servicer this loan was securitized and sold to a REMIC [REAL ESTATE MORTGAGE INVESTMENT CONDUIT] called US BANK, NATIONAL ASSOCIATION as Indenture Trustee of the GMACM Home Equity Loan Trust 2006-HE-4., see **Exhibit B**, a response letter that came to me as the result of a QWR I sent to the Loan Servicer, attached and incorporated by reference. Maryland Commercial Code and the UCC requires the note and Deed of Trust to be assigned to the Trustee of a REMIC, see UCC 3-110 and Maryland Commercial Code Section 3-110. The note was assigned to GMAC MORTGAGE, LLC and was never assigned to the Trustee of the above REMIC as required by section of the Maryland Commercial Code cited above.

4. In addition, the Substitution of Trustee was a forgery, signed on March 11, 2015 by an employee of GMAC MORTGAGE, LLC while GMAC MORTGAGE, LLC was in Chapter 11 bankruptcy, see **Exhibit C**, attached and incorporated by reference. The signer of the document claimed to be an Executive of OCWEN LOAN SERVICING, LLC in order to make it appear that they were acting consistently with the flawed and defective Assignment of Deed of Trust, described above. This document was signed in Montgomery County, Pennsylvania, the headquarters office for GMAC MORTGAGE, LLC.

**THE DEFENDANTS PRINCIPAL AND AGENCY RELATIONSHIP IS CHALLENGED**

5. Key to the whole issue here is that agency cannot be presumed, and the party asserting agency carries the burden to prove it. See Schultz v. Rural/Metro Corp., 956 S.W.2d 757, 760 (TX App. – Houston [14th Dist.] 1997, no writ); Zuniga v. Navarro & Assocs., P.C., 153 S.W.3d 663 (TX App. – Corpus Christi 2005, pet. denied) (citing Bernsen v. Live Oak Ins. Agency, 52 S.W.3d 306, 309 (TX App. – Corpus Christi 2001, no pet.)); Alamo Cmty. Coll. Dist. v. Browning Constr. Co., 113 S.W.3d 146 (TX App. – San Antonio 2004, pet. dism'd) (citing S. County Mut. Ins. Co. v. First Bank & Trust, 750 S.W.2d 170, 172 (TX 1988)); Disney Enters., Inc. v. Esprit Fin., Inc., 981 S.W.2d 25, 30 (TX App. – San Antonio 1998, pet dism'd w.o.j.); Gray v. Black, 267 S.W. 291 (TX Civ. App. 1924) (agency is not presumed; wife cannot be presumed to be husband's agent). "[O]nly an alleged principal's words or conduct that are represented to the third party can clothe an alleged agent with apparent authority. [BML Stage Lighting, Inc., v. Mayflower Transit, Inc., 14 S.W.3d 395, 401 (TX App. – Houston [14th Dist.] 2000, pet. denied)]." Coleman v. Klockner & Co. AG, 180 S.W.3d 577, 588 (TX App. – Houston [14th Dist.] 2005, n.w.h.) (Coleman). In short, the alleged agent's word, alone, never proves agency.

6. Therefore, where agency has been challenged, as it is, here, and where it's presumed into existence over that objection, the burden of proof has been shifted. Beard v. Banks, 542 U.S. 406 (2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)); Scott v. Harris, __ U.S. __, 127 S. Ct. 1769 (2007) (citing United States v. Diebold, 369 U.S. 654, 655 (1962)) (summary judgment presumptions are against movant). Mullaney v. Wilbur, 421 U.S. 684 (1975) (citing In re Winship, 397 U.S. 358 (1970)) (to relieve the plaintiff of burden is to violate Due Process); Heiner v. Donnan, 285 U.S. 312 (1932) (fraud and/or negligence context).

**CHALLENGE IS TO BOTH ACTUAL AND APPARENT AUTHORITY.**

7. Where there is no evidence, that a principal authorized someone to act as its agent, agency cannot be proven by declarations of the alleged agent." T & R Custom, Inc. v. Liberty Mut. Ins. Co., 227 Ga. App. 144, 145 (1) (488 S.E.2d 705) (1997). Accord Oglesby v. Farmers Mut. Exchange, 128 Ga. App. 387, 389 (6) (196 S.E.2d 674) (1973); Greble v. Morgan, 69 Ga. App. 641 (1) (26 S.E.2d 494) (1943). (1) Because there is no evidence in the record of Hilliard's agency, other than the hearsay itself, the evidence was properly excluded. See, e.g., Process Posters, Inc. v. Winn Dixie Stores, 263 Ga. App. 246, 250-251 (1) (587 S.E.2d 211) (2003). It is fundamental that agency cannot be proven by the declaration of the agent. LAVELLEUR v. NUGENT, 186 Iowa 234 (Iowa 1919)

8. Arizona law provides that agency cannot be proven by the acts or declarations of the purported agent. Cameron v. Lanier, 56 Ariz. 400, 108 P.2d 579, 580 (Ariz. 1940). Instead, Relator "must prove affirmatively the authority" of Mr. Anderson to accept service on behalf of Dr. Levit, by either showing direct authority or implied authority. Id.United States ex rel. Goulooze v. Levit, 2006 U.S. Dist. LEXIS 77913 (D. Ariz. 2006)

9. Looking first to the concept of apparent authority, it is axiomatic that such authority exists only where there is a manifestation by the principal to a third party which causes the third party reasonably to believe that the particular person with whom the third party is dealing has the authority to enter into negotiations or to make representations on behalf of the principal. The State Life Insurance Co. v. Thiel (1939), 107 Ind. App. 75, 20 N.E.2d 693; Kody Engineering Company, Inc. et al. v. Fox and Fox Insurance Agency, Inc. (1973), 158 Ind. App. 498, 303 N.E.2d 307, 39 Ind. Dec. 537. Such a manifestation by the principal may be found when the principal holds out an agent as a general agent and the third party reasonably believes that the authority exhibited is the type usually held by one in such a position; n2 or, where the principal clothes or allows a special agent to act with the appearance of possessing more authority than is

1   actually conferred. See: Farm Bureau Mutual Life Insurance Company v. Coffin (1962), 136 Ind.

2   App. 12, 186 N.E.2d 180. Thus, to prove  the existence of apparent authority, it is necessary to

3   establish some conduct on the part of the principal which created the appearance of authority.

4   The representations of the agent will not suffice, for it is the "well established rule that agency

5   cannot be proven by the declarations of the agent, alone." Pan American World Airways, Inc. v.

6   Local Readers Service, Inc. (1968), 143 Ind. App. 370, 377, 240 N.E.2d 552, 556, 15 Ind. Dec.

7

8   429, 435.Storm v. Marsischke, 159 Ind. App. 136 (Ind. Ct. App. 1973)

9       10. It is elementary law that agency cannot be proven by the acts or declarations of the

10  alleged agent. Newman v. Taylor, 69 Miss. 670, 13 So. 831; R. R. Co. v. Cocke, 64 Miss. 713, 2

11  So. 495; Kinnare v. Gregory, 55 Miss. 612; Gilchrist v. Pearson, 70 Miss. 351, 12 So. 333. "An

12  agent's authority cannot be proved by his acts done without the knowledge or authority of his

13  principal." Whiting v. Lake, 91 Pa. 349.  Therrell v. Ellis, 83 Miss. 494 (Miss. 1903)

14

15      12. Current practices concerning consumer mortgages wherein the promise to pay (note)

16  is immediately sold into an investment pool then the pool is divided up among a host of investors

17  then pieces are sold back and forth between parties leaves the true holder of the note in question.

18  With the current, highly publicized practices of registering the note with Mortgage Electronic

19  Registration Service (MERS) for the purpose of hiding the true holder of the note behind MERS

20  as a so-called "nominee" has been discredited by the courts.  (see Landmark v Kessler and

21  others)   The courts have held the practice of using a straw man holder of the note to hide the

22  multiple sales of the note on the secondary consumer mortgage market as a scam to avoid the

23

24  requirement that the sale of a security instrument based on a consumer mortgage transaction be a

25  public transaction.

26      13. Plaintiffs challenge Defendant's authority, both as to actual authority and as to

27  apparent authority.   Actual authority arises where the principal authorizes the agent. See

28

1  Cameron County Sav. Ass'n v. Stewart Title Guaranty Co., 819 S.W.2d 600, 603 (TX App. –

2  Corpus Christi 1991, writ denied). Plaintiff demands that Defendant establish the entire chain of

3  agency, from inception of the note up to the current alleged holder. Without said proof, no one

4  has signature authority.  Apparent authority doesn't exist, either.  The Defendants now have the

5  burden to prove agency. See Schulz, etc., supra.  Again, where that burden is presumed and not

6  compelled proved, the burden, by this request, has been shifted. Cf. Coleman.

7

8       14. Plaintiff, on investigation and belief, alleges that Defendant violated the Fair Debt

9  Collections Protections Act to the detriment of Plaintiff by using false, deceptive, and misleading

10  representations or means in connection with the collection of an alleged debt wherein Defendant

11  misrepresented the character, amount, and legal status of the alleged debt; (15 USC 1692(e)(2))

12  & (f), and by threatening to take action against Plaintiff that could not legally be taken. (15 USC

13  1692(e)(5)).  By causing to be sent to Plaintiff, through the United States mail, fraud and/or

14  negligent demands for payment for which Defendant had no authority to make.  Plaintiff alleges

15  and avers that Defendant caused to be sent through the United States Mail Service, fraud and/or

16

17  negligent demands for payment from Plaintiff in order to facilitate the herein alleged fraud

18  and/or negligence.  Plaintiff alleges and avers that Defendant subjected Plaintiff to a fraud and/or

19  negligence scheme to collect monies not owed to Defendant and that Defendant intended to

20  collect the full amount on an alleged debt, which over the term of the alleged debt would amount

21  to (full amount of principal and interest over term of alleged note), 88403.91.

22

23       15. The Plaintiff alleges and avers that the above alleged scheme has the result of making

24  it impossible for a purchaser of a private residence involved in said scheme to ever achieve the

25  primary purpose of the contract, that of achieving quiet title at completion of the contract.

26

27

28
_____

16. Plaintiff alleges and avers that the above alleged scheme has the result of making it impossible for a purchaser of a private residence involved in said scheme to ever achieve the primary purpose of the contract, that of achieving quiet title at completion of the contract. Plaintiff alleges and avers that Defendant failed to exercise due diligence concerning Defendant's standing to collect the alleged debt claimed by Defendant to be owed to Defendant or Defendant's principal, by Plaintiff.

17. Plaintiff alleges and avers that Defendants subjected Plaintiff to severe emotional stress through direct or implied threat that Plaintiff would lose Plaintiff's primary place of residence if Plaintiff failed to pay the extortion demanded by Defendant.

18. Looking first to the concept of apparent authority, it is axiomatic that such authority exists only where there is a manifestation by the principal to a third party which causes the third party reasonably to believe that the particular person with whom the third party is dealing has the authority to enter into negotiations or to make representations on behalf of the principal. The State Life Insurance Co. v. Thiel (1939), 107 Ind. App. 75, 20 N.E.2d 693; Kody Engineering Company, Inc. et al. v. Fox and Fox Insurance Agency, Inc. (1973), 158 Ind. App. 498, 303 N.E.2d 307, 39 Ind. Dec. 537. Such a manifestation by the principal may be found when the principal holds out an agent as a general agent and the third party reasonably believes that the authority exhibited is the type usually held by one in such a position; n2 or, where the principal clothes or allows a special agent to act with the appearance of possessing more authority than is actually conferred. See: Farm Bureau Mutual Life Insurance Company v. Coffin (1962), 136 Ind. App. 12, 186 N.E.2d 180. Thus, to prove the existence of apparent authority, it is necessary to establish some conduct on the part of the principal which created the appearance of authority. The representations of the agent will not suffice, for it is the "well established rule that agency cannot be proven by the declarations of the agent, alone." Pan American World Airways, Inc. v.

1    Local Readers Service, Inc. (1968), 143 Ind. App. 370, 377, 240 N.E.2d 552, 556, 15 Ind. Dec.

2    429, 435.Storm v. Marsischke, 159 Ind. App. 136 (Ind. Ct. App. 1973)

3          19. It is elementary law that agency cannot be proven by the acts or declarations of the

4    alleged agent. Newman v. Taylor, 69 Miss. 670, 13 So. 831; R. R. Co. v. Cocke, 64 Miss. 713, 2

5    So. 495; Kinnare v. Gregory, 55 Miss. 612; Gilchrist v. Pearson, 70 Miss. 351, 12 So. 333. "An

6
     agent's authority cannot be proved by his acts done without the knowledge or authority of his
7
     principal." Whiting v. Lake, 91 Pa. 349.   Therrell v. Ellis, 83 Miss. 494 (Miss. 1903)
8
9          20. Determining that "there is abundant evidence of the use of abusive, deceptive, and

10   unfair debt collection practices by many debt collectors," Congress passed the Fair Debt

11   Collection Practices Act (FDCPA) to eliminate those practices. 15 U.S.C. § 1692(a).  The

12   FDCPA protects  consumers who have been subjected to abusive, deceptive or unfair debt

13   collection practices by a debt collector in an attempt to collect a debt. *See Piper v. Portnoff*, 396

14   F.3d 227, 232 (3d Cir. 2005) (citing 15 U.S.C. §§ 1692e-f).

15
           21. Defendants, in the instant case, are not a party Plaintiff knowingly entered into a
16
     contract with.  Defendants claim to hold agency or standing as a trustee or assignee of a debt.
17
18   The allegation of Defendant is that Defendant is collecting a debt concerning a consumer

19   mortgage agreement.

20         22. An assignee or substitute trustee, it is a debt collector within the meaning of §§

21   1692d, 1692e or 1692g4 of the FDCPA fails as a matter of law.  More specifically, the argument

22
     that pursuant to the terms of § 1692a(6), assignees or substitute trustees are only liable under §
23
24   1692f(6) fails as a matter of law.  Section 1692a(6) states, in relevant part, that for the purpose of

25   section 1692f(6) of this title, the term "debt collector" also includes any person who uses any

26   instrumentality of interstate commerce or the mails in any business the principal purpose of

27   which is the enforcement of security interests.  Based on this language, any argument that

28   _____

1   assignees or substitute trustees are exempt from liability under all provisions of the FDCPA

2   *except* § 1692f(6) fail as a matter of law.

3       23. Plaintiff alleges that a mortgage is a "debt" as defined by 15 U.S.C. § 1692a(5)

4   because it constitutes an obligation to pay money that arose out a transaction in which the

5   property was primarily for personal, family or household purposes.  Plaintiff also asserts that,

6   even if  Defendant  is unquestionably an assignee or substitute trustee, that fact does not preclude

7
    it from being held liable as a debt collector.   *Piper*, 396 F.3d at 232 (applying the FDCPA to
8
9   debts secured by real property); *Romea v. Heiberger & Assocs.*, 163 F.3d 111, 116 (2d Cir. 1998)

10  (concluding that an eviction notice for failure to pay rent can be an attempt to collect a debt);

11  *Shapiro & Meinhold v. Zartman*, 823 P.2d 120, 124 (Colo. 1992) (holding that "a foreclosure is a

12  method of collecting a debt" and, thus, the defendant attorneys "are not exempt merely because

13  their collection activities are primarily limited to foreclosures") *with Jordan v. Kent Recovery*

14  *Servs., Inc.*, 731 F. Supp. 652, 658 (D. Del. 1990) (distinguishing a debt collector from an
15
    enforcer of a security interest, who has a "present right to a piece of secured property and
16
17  attempts to retrieve something which another person possesses but which the holder of the

18  security interest still owns").

19      24. Plaintiff directs the court to consider the Fourth Circuit case of *Wilson v. Draper &*

20  *Goldberg, PLLC,* 443 F.3d 373 (4th Cir. 2006). The plaintiff in *Wilson* brought suit against the

21  law firm that acted as the substitute trustee for the holder of the deed of trust on the plaintiff's
22
    property. The defendant initiated foreclosure proceedings on the plaintiff's property and sent her
23
24  a notice that provided information regarding the creditor and the amount of the debt owed. *Id.*

25  The *Wilson* defendants included in their notice a statement specifying that they were not "'debt

26  collectors' or acting in connection with the collection of a 'debt.'" *Id.* Nevertheless, the court

27  held that the default on a Deed of Trust Note is a debt, and that concluding otherwise "would

28

1    create an enormous loophole in the [FDCPA] immunizing any debt from coverage if that debt

2    happened to be secured by a real property interest and foreclosure proceedings were used to

3    collect that debt." *Id.* at 376 (citing *Piper*, 396 F.2d at 234; *Romea*, 163 F.3d at 116; *Shapiro*,

4    823 P.2d at 124). The *Wilson* court went on to explain:

5    Section 1692a(6) applies to those whose only role in the debt collection process is the

6    enforcement of a security interest. See Jordan[, 731 F. Supp. at 657] ("It thus appears that

7    Congress intended an enforcer of a security interest, such as a repossession agency, to fall

8    outside the ambit of the FDCPA except for the provisions of § 1692f(6)."). In other words, this

9    provision is not an exception to the definition of debt collector, it is an inclusion to the term debt

10   collector. It serves to include as debt collectors, for the purposes of § 1692f(6), those who only

11   enforce security interests. It does not exclude those who enforce security interests but who also

12   fall under the general definition of "debt collector." See Piper, 396 F.3d at 236 ("Section

13   1692a(6) thus recognizes that there are people who engage in the business of repossessing

14   property, whose business does not primarily involve communicating with debtors in an effort to

15   secure payment of debts."). <u>443 F.3d at 378</u> (emphasis in original).

16

17

18        25. Even if Defendant herein alleges to be acting as an assignee or substitute trustee to

19   enforce a Deed of Trust Note, nevertheless, in initiating collection proceedings, Defendant

20   undertook the role of debt collector and communicated with the Plaintiff in a manner regulated

21   by the FDCPA. *See Wilson,* 443 F.3d at 376-78. Adopting a position that entities acting as

22   assignees or substitute trustees for mortgage holders are exempt from the provisions of the

23   FDCPA is contrary to the stated purpose of the FDCPA. *See* 15 U.S.C. § 1692(a) (explaining that

24   the FDCPA is designed to protect consumers from unfair collection practices). Accordingly,

25   Plaintiff has alleged sufficient facts to support the claim that, for the purposes of the actions

26

27

28

described in the complaint, the Defendant is attempting to collect a "debt" and Defendant was acting as a "debt collector."

26. As a result, the above described forgery by the INDECOMM GLOBAL SERVICES employee, Samuel Dane Strandmo, of the Assignment of the Deed of Trust to OCWEN LOAN SERVICING, LLC without a Power of Attorney signed by HOMECOMINGS FINANCIAL, LLC is an act of fraud and was designed to deceive the Plaintiff and the public into believing that MERS is authorized to act on behalf of the original lender, HOMECOMMINGS FINANCIAL, LLC, to the detriment of the plaintiff. As discussed, MERS cannot act on behalf of the original lender as a nominee when the original lender is in bankruptcy without violating the Federal Rules of Bankruptcy. It is well established that MERS has admitted that they are not a mortgage creditor and do not have the authority to assign deeds of trust and mortgages. In MERS v. Nebraska Department of Banking and Finance, No. 270 Neb. 529, 704 N.W.2d 784 (2005), the court stated: "Further, MERS argues that it does not own the promissory notes secured by the mortgages and has no right to payments made on the notes." The Nebraska Supreme Court then concluded that MERS is not a mortgage banker under Nebraska Law. MERS argued in that forum that it is *not* authorized to engage in the practices that would make it a **party to either the enforcement of mortgages or the transfer of mortgages**. In *Mortgage Elec. Reg. Sys. v. Nebraska Dept. of Banking*, 270 Neb. 529, 704 N.W.2d 784 (2005), MERS challenged an administrative finding that it was a mortgage banker subject to license and registration requirements.

27. Furthermore, the Assignment of Deed of Trust assigns a Deed of Trust for a loan that was already paid in full, see affidavit in support, filed in this case to support the claims made in this complaint, which states that the 2046 Balance Sheet and that the 1099 OID document that is in possession of the Defendants, supplies incontrovertible evidence that the Dale Young loan was

paid in full. The 2046 Balance Sheet is a standard part of the internal accounting methods that are used by banks and is substantiates the fact that the Dale Young loan was paid in full. In addition, the 1099 OID is further evidence that the Dale Young loan was paid off in full, since the nature of the claims made by the banks, when using the 1099 OID is an artifact of the final payoff of the mortgage loan.

28. Thus, foreclosure of the mortgage debt by the Defendants, and all of them related to the above referenced Deed of Trust, without having been assigned the Deed of Trust, is unlawful and a violation of Title 18, US Code § 891-894, Extortionate Credit Transactions and a violation of Title 18, US Code § 1962(a), collection of an unlawful debt and a violation of Title 15 US Code §§ 1692e, misrepresentation and 1692f, unfair practices. This double recovery, the collection of a debt when the Lender or a loan servicer has obtained payment from a Private Mortgage Insurance Carrier is also a predicate act of racketeering under Title 18, US Code § 1962 et seq.

29. The Defendants participated in the mortgage fraud by selling the house that is the subject of this complaint in a foreclosure sale, and, collecting money from a defaulted mortgage loan twice, once from an insurance carrier and once from the sale of our house in a foreclosure sale. There is good evidence that this loan was insured with both pool insurance and mortgage insurance, see **Exhibit D**, attached and incorporated by reference. In addition, the loan was paid off much earlier as evidenced by the 2046 Balance Sheet, which is an internal accounting process that memorializes the loan pay off and the 1099 OID, filed by the banks with the IRS, which substantiates the fact that the loan was paid off as well.

30. The subject property on1314 Dillon Court, Capital Heights, Maryland, was subjected to a foreclosure process by the Defendants after the Defendants collected on mortgage insurance claims, which assisted the alleged mortgage creditor with their efforts at obtaining payment three

times: (a.) once for the foreclosure of my home, and (b.) from the payment of an insurance claim, which constitutes double recovery and (c.) an additional time after the banks accounting practices revealed that the 2046 Balance Sheet and the 1099OID forms were filed by the original lender. The above-described double recovery and defective assignment allegedly executed by a MERS executive was intentionally calculated to deceive the Plaintiffs and to misrepresent themselves as creditors. MERS cannot assign a Deed of Trust as an agent of the original lender when the original lender  (a.) has ceased business operations, and (b.) MERS was never in possession of a power of attorney from the original lender giving MERS authority to assign the mortgage. These predicate acts and activities misled the Plaintiff and were designed to unlawfully obtain title to the subject property, to the detriment of the Plaintiffs and they were done without reference to a lawful exercise of the lawful rights of the Defendants. The second and third predicate acts of racketeering were the filing of a foreclosure action in state court without standing and the sale of the subject property in a foreclosure sale. The Second Assignment of Deed of Trust conveys no right, title and interest in the subject Deed of Trust, since the First Assignment of Deed of Trust was so deeply flawed and defective, as discussed.

31. **Additional Predicate Acts of Racketeering:** The Broken chain of title in the Assignment of the Deed of Trust, which is flawed, defective and fraudulent, especially after it was paid in full is a predicate act. The Deed of Trust is allegedly assigned by MERS to OCWEN LOAN SERVICING, LLC by an alleged MERS  executive, in his alleged capacity as an Assistant Secretary for MERS, without any documentation of his executive appointment status from MERS, and when the original lender was operating under a Chapter 11 Bankruptcy, which bars any assignment of assets of the lender when they are in bankruptcy without permission of the bankruptcy judge and participation of the bankruptcy trustee.

32. The major flaws in this assignment are two-fold. First, the Assignment was signed by an INDECOMM GLOBAL SERVICES employee, Samuel Dane Strandmo, on December 10, 2014, and nowhere has there been an effort by the signer to identify the document that gives her a power of attorney from HOMECOMINGS FINANCIAL, LLC to assign the Deed of Trust on their behalf. In addition, there is no executive appointment by the MERS Board of Directors appointing Shannon Mayfield as a MERS executive. As a result, the alleged assignment by MERS of the above referenced Deed of Trust, without having been assigned the note, is unlawful and a violation of Title 18, US Code § 891-894, Extortionate Credit Transactions and a violation of Title 18, US Code § 1962(a), collection of an unlawful debt and a violation of Title 15 US Code §§ 1692e, misrepresentation and 1692f, unfair practices, especially after the loan was paid in full as discussed. The above-described assignment, see **Exhibit A**, attached and incorporated by reference, alleged executed by a so-called MERS executive was intentionally calculated to deceive the Plaintiffs and to misrepresent themselves as creditors so that they could collect the mortgage debt twice. See **Exhibit D**, the portion of the Prospectus supplement that states that the Trust (a REMIC) will purchase mortgage insurance and pool insurance to cover loan defaults. The exhibit is attached and incorporated by reference. These predicate acts and activities misled the Plaintiff and were designed to deceive the Plaintiffs and unlawfully obtain title to the subject property, to the detriment of the Plaintiffs and these predicate acts were done without reference to a lawful exercise of the lawful rights of the Defendants.

33. All of the subsequent correspondence from the alleged lender attempting to collect the debt, as a stranger to the transaction, was a predicate Act of Racketeering and is an Extortionate credit transaction in violation of Title 18, US Code §§ 891-894 and a violation of mail fraud and wire fraud statutes, Title 18 US Code, § 1341 and 1343. The above-described assignment alleged executed by a so called MERS executive, falsely presenting himself as a

MERS executive, was intentionally calculated to deceive the Plaintiffs and to misrepresent themselves as creditors to the detriment of the Plaintiffs. This calculated and willful deceit occurred on May 13, 2014, when the Assignment was executed by Samuel Dane Strandmo, or one of his associates, signing his name. This was done in order to collect the debt twice, or even three times. These predicate acts and activities misled the Plaintiff and were intentionally done and designed to unlawfully obtain title to the subject property, to the detriment of the Plaintiffs and they were done without reference to a lawful exercise of the rights of the Defendants. In the above-described first Assignment of Deed of Trust Samuel Strandmo falsely describes himself as a MERS executive, with no evidence of any management responsibilities at MERS, official executive level duties at MERS or an appointment from MERS Board of Directors as an Assistant Secretary. Clearly this is a forgery, since MERS has no offices in Ramsey County, Minnesota, while INDECOM GLOBAL SERVICES has offices in that region of Minnesota.

34. There have been multiple violations of mail fraud and wire fraud pursuant to Title 18, US Code, §§ 1341 and 1343 related to the double recovery, and the unlawful foreclosure, which is unlawful in the context of the payment by the insurance carrier of a claim for mortgage insurance and the use of a signer of the Assignment of Deed of Trust who lacked standing and the evidence that the mortgage debt was paid in full, discussed above. The Assignment of Deed of Trust, discussed above, is void on its face and void ab-initio.

35. The racketeering acts are continuing and related, since they are all designed to foreclose on the subject property and to obtain possession of the subject property unlawfully, since the loan is paid in full. There is an ongoing effort by the defendants to obtain unlawful possession of the subject property.

36. The Defendants violated the RICO statutes, specifically Title 18, US Code, §§ 1962(a), 1962(c) and 1962(d) and 891-894 by billing the Plaintiff for an interest rate and finance charges that violate the Truth in Lending Act.

37. As an inducement to procure this loan, the lender ignored and/or never verified the income of the borrower. By failing to use reliable income information, the DTI (Debt to Income Ratio) is more than 44%, causing a payment shock to us as the borrowers. If an underwriter had properly evaluated the loan there would be no question about the borrower's capacity to repay the loan.

## II. PARTIES

### Parties/ Plaintiff

38. I, The Plaintiff am Dale Christopher Young, and I am the lawful owner of the property at 1314 Dillon Court, Capital Heights, Maryland. When I examined the prospectus, see **Exhibit D**, attached and incorporated by reference, I discovered that the Defendants purchased mortgage insurance and pool insurance. I realized that a portion of my monthly payments were used to pay for mortgage insurance without disclosure and, therefore the threatened foreclosure is a predicate act of racketeering and that the foreclosure. This was done even though the Defendants had collected mortgage insurance and pool insurance from my monthly mortgage payments and subsequently filed a claim with one of the major mortgage insurance carriers coupled with other predicate acts, described above, and, thus, are not lawful and constitute a pattern of racketeering activity. In addition, the payoff of the loan that is substantiated by the 2046 Balance Sheet and the 1099 OID is further evidence of the series of predicate acts that form the foundation for the claims of RICO violations.

39. The double recovery that resulted is one of several predicate acts of racketeering. The assignments of the Deed of Trust by those who are not assignees and, in the case of the assignment of Deed of Trust, was done after the original lender HOMECOMINGS FINANCIAL, LLC ceased business operations as a mortgage lender because of a Chapter 11 bankruptcy filing, as discussed. Thus, MERS could no longer claim to be an agent of HOMECOMINGS FINANCIAL, LLC, and, as discussed above, they never had a power of attorney to assign the Deed of Trust and HOMECOMINGS was under the fiduciary control of a bankruptcy trustee while they were in bankruptcy prior to when the Assignment was executed. As a result, this Assignment of Deed of Trust was a major predicate act of racketeering. The void assignment of Deed of Trust makes all subsequent recorded documents, especially the Substitution of Trustees void also.

40. The Substitution of Trustee was also signed by a stranger to the transaction, since the Assignment of Deed of Trust was executed by an OCWEN LOAN SERVICING, LLC executive, while mis-representing herself as having the capacity and standing to substitute trustee while HOMECOMINGS is in bankruptcy, although there is no prior Assignment of Deed of Trust from HOMECOMINGS to OCWEN LOAN SERVICING, LLC. Thus, the Substitution Of Trustee document recorded are also a predicate acts of racketeering designed to deceive the Plaintiff and the public into believing that the assignee is OCWEN LOAN SERVICING, LLC so that the loan servicer, OCWEN LOAN SERVICING misrepresented themselves as having the powers to substitute trustees, even though their assignor could not assign assets of a bankrupt entity without permission of a bankruptcy judge. There is no evidence that HOMECOMINGS ever obtained permission or leave from a bankruptcy judge to assign the Dale Young Deed of Trust to a third party. OCWEN LOAN SERVICING, LLC violated Title 15, US Code, § 1641(f), prohibiting the loan servicers from acting as an assignee of the Deed of Trust for administrative convenience,

another predicate act of racketeering. **Part of the reason these predicate acts form a pattern of racketeering activity is that the recordation of the Assignments of the Deed of Trust and the Substitutions of Trustee involved the use of false statements and misrepresentation of their status as signers and as a party that has standing**. In addition, the correspondence from the Defendants warning us of their intention to foreclose is also part of the same pattern of misrepresentation and deception, and constitute additional predicate acts, because, in part, they have a mortgage insurance policy in place to pay the unpaid portion of the mortgage, so there is no need to foreclose. In addition, the Defendants claimed that the property was sold in a foreclosure sale to a company called SECURED IMPROVEMENTS, LLC, even though there was no ratification by a Circuit Court Judge in Maryland giving the trustees the authority to sell Abdullah H. Hijazzi has acted on behalf of SECURED IMPROVEMENTS, LLC in order to assist the other Defendants in unjustly enriching themselves and to engage in their wrongful foreclosure by placing notices on the Plaintiff's door stating that they had filed an Wrongful Detainer case against me, even though there I record of an auction. It appears that their intentions are to evade the civil process used in Maryland for a Mortgage foreclosure, since there was no notice given of an auction for that property.

## Parties/ Defendants

41. The Chief and principal Defendant, who plans, sets policy, organizes and directs the activities of the other Defendants in the racketeering enterprise is MARK RUNKEL, Chief Credit Officer, at US BANK, NATIONAL ASSOCIATION. US BANK, NATIONAL ASSOCIATION, hereinafter US BANK is the trustee for GMACM Home Equity Loan Trust 2006-HE-4. PW PARKER, vice Chairman and Chief risk officer and his associate MARK

RUNKEL are the executives that set policy and plan and implement the management of mortgage backed securities held and managed by US BANK. The Defendants are operating and managing a racketeering enterprise through the use of the courts, the administrative process, correspondence and agents and assigns. The steps that were taken to foreclose were carefully calculated to cover up the defects in the Assignments of the Deed of Trust, specially in the aftermath of the bankruptcy of RESIDENTIAL CAPITAL, LLC and its subsidiaries, including HOMECOMINGS FINANCIAL, LLC.

42. The recordation of the assignment of Deed of Trust and the Substitution of Trustees was carefully crafted to avoid addressing issues related to standing and capacity of the alleged mortgage creditor in this matter. The policies of the racketeering enterprise were carried into effect by the other Defendants especially Samuel Dane Strandmo, an employee at INDECOMM GLOBAL SERVICES. MARK RUNKEL is the Chief Credit Officer at US BANK who carries out the foreclosure policies and practices for that bank at the Direction and with the concurrence of PW PARKER. These executives are also a top director of policy and operations and directed the activities of the other Defendants. The law firm and their lead attorneys, BWW named above, have also carried out the policies of the enterprise at the Direction of the senior management of US BANK. US BANK, NATIONAL ASSOCIATION is the trustee of the REMIC described above, and derives fees and profits from the management of the securities under their control. That is the REMIC that appears to have acquired the Dale Young loan, according to the correspondence that I received from the alleged creditors, see **Exhibit B**, attached and incorporated by reference. A mortgage foreclosure service provider called INDECOMM GLOBAL SERVICES prepared the fraudulent Assignment of the Deed of Trust for the subject property as discussed above. This can be seen by the attributions given to the document preparation portion of this recorded document. BWW LAW GROUP, LLC filed pleadings in

court making false statements and mailed correspondence to the Plaintiffs falsely claiming that their clients, BANK OF AMERICA, NA, BAYVIEW LOAN SERVICING, LLC and US BANK are mortgage creditors.

43. A power of attorney is necessary to show how the agent is vested with authority to assign a mortgage, HSBC BANK, USA, NA v, Yeasmin, 866 NY S 2d 92(2008). A number of Judges around the nation have evaluated the status of MERS and their relationship with lenders and have concluded that MERS does not have a sufficient agency relationship with the lender that gives them the powers to assign a note or mortgage. Because MERS's members, the beneficial note holders, purported to bestow upon MERS interests in real property sufficient to authorize the assignments of mortgage, the alleged agency relationship must be committed to writing by application of the statute of frauds.

44. In *LaSalle Bank, N.A. v. Bouloute* the court concluded that MERS must have some evidence of authority to assign the mortgage in order for an assignment of a mortgage by MERS to be effective. Evidence of MERS's authority to assign could be by way of a power of attorney or some other document executed by the original lender. *See Bouloute*, 2010 WL 3359552, at *1; *Alderazi*, 900 N.Y.S.2d at 823 ("'To have a proper assignment of a mortgage by an authorized agent, a power of attorney is necessary to demonstrate how the agent is vested with the authority to assign the mortgage.'") (quoting *HSBC Bank USA, NA v. Yeasmin*, 866 N.Y.S.2d 92 (N.Y. Sup. Ct. 2008)).

45. Other than naming MERS as "nominee", the Mortgage also provides that the Borrower transfers legal title to the subject property to MERS, as the Lender's nominee, and acknowledges MERS's rights to exercise certain of the Lender's rights under state law. This, too, is insufficient to bestow any authority upon MERS to assign the mortgage. In *Bank of New York v. Alderazi*, the court found "[t]he fact that the borrower acknowledged and consented to

MERS acting as nominee of the lender has no bearing on what specific powers and authority the lender granted MERS." *Alderazi*, 900 N.Y.S.2d at 824.  Even if it did bestow some authority upon MERS, the court in *Alderazi* found that the mortgage did not convey the specific right to assign the mortgage. The Court agrees with the reasoning and the analysis in *Bouloute* and *Alderazi*, and the other cases cited herein, and finds that the Mortgage, by naming MERS a "nominee," and/or "mortgagee of record" did not bestow authority upon MERS to assign the Mortgage. See also Bank of America, NA v. Greenleaf, 2014 ME 89, (Maine Sup Ct, 2014) the Court in B of A v. Greenleaf, supra at page 2, stated,  "We agree that the Bank lacks standing to seek foreclosure of the property, and we vacate the judgment." They stated further: "[¶16] When MERS then assigned its interest in the mortgage to BAC, it granted to BAC only what MERS possessed—the right to record the mortgage as nominee—because MERS could not have granted to another person or entity any greater interest in the mortgage than that enjoyed by MERS. *See Sturtevant v. Town of Winthrop*, 1999 ME 84, ¶ 11 n.4, 732 A.2d 264 (stating that "an assignee has no greater rights than his assignor")." See also In re Ferrel Agard, US Bankruptcy Court Eastern District Of New York, 10-77338-reg, "However, without more, this Court finds that MERS's "nominee" status and the rights bestowed upon MERS within the Mortgage itself, are insufficient to empower MERS to effectuate a valid assignment of mortgage." The Court went on to say: the Treasurer of MERS, William C. Hultman, declared under penalty of perjury that "pursuant to the MERS's Rules of Membership, Rule 2, Section 5. . . First Franklin appointed MERS to act as its agent to hold the Mortgage as nominee on First Franklin's behalf, and on behalf of First Franklin's successors and assigns." (Affirmation of William C. Hultman, ¶7). However, Section 5 of Rule 2, which was attached to the Hultman Affirmation as an exhibit, contains no explicit reference to the creation of an agency or nominee relationship. Consistent with this failure to explicitly refer to the creation of an agency agreement, the rules of

membership do not grant any clear authority to MERS to take any action with respect to the mortgages held by MERS members, including but not limited to executing assignments."

46. Because MERS's members, the beneficial note holders, purported to bestow upon MERS interests in real property sufficient to authorize the assignments of mortgage, the alleged agency relationship must be committed to writing by application of the statute of frauds.

47. Thus foreclosure of the mortgage debt by the Defendants, and all of them related to the above referenced Deed of Trust, without having been assigned the mortgage, is unlawful and a violation of Title 18, US Code § 891-894, Extortionate Credit Transactions and a violation of Title 18, US Code § 1962(a), collection of an unlawful debt and a violation of Title 15 US Code §§ 1692e, misrepresentation and 1692f, unfair practices. This double recovery is also a predicate act of racketeering under Title 18, US Code § 1962 et seq.

48. The Defendants participated in the mortgage fraud by selling our home in a foreclosure sale, and collecting money from a defaulted mortgage loan twice, once from a mortgage insurance carrier and once from the sale of our primary residence in a foreclosure sale. The subject property was purchased after the Defendants collected on mortgage insurance claims, which assisted the alleged mortgage creditor with their efforts at obtaining payment twice for the foreclosure of our home, and from the payment of an insurance claim, which constitutes double recovery. The above-described double recovery allegedly executed by a MERS executive was intentionally calculated to deceive the Plaintiffs and to misrepresent themselves as creditors. MERS cannot assign a Deed of Trust as an agent of the original lender when the original lender: (a.) has ceased business operations, and (b.) MERS was never in possession of a power of attorney from the original lender giving MERS authority to assign the mortgage. These predicate acts and activities misled the Plaintiff and were designed to unlawfully obtain title to the subject properties, to the detriment of the Plaintiffs and they were done without reference to a lawful

1    exercise of the lawful rights of the Defendants. The second and third predicate acts of

2    racketeering were the filing of a foreclosure action in state court without standing and the sale of

3    the subject property in a foreclosure sale.

4        49. **Additional Predicate Act of Racketeering:** The Broken chain of title in the

5    Assignment of the Deed of Trust, which is flawed and defective and fraudulent as discussed. The

6    Deed of Trust is allegedly assigned by MERS to OCWEN LOAN SERVICING, LLC.

7        50. As a result, the alleged assignment by MERS of the above referenced Deed of Trust,

8    without having been assigned the note, is unlawful and a violation of Title 18, US Code § 891-

9    894, Extortionate Credit Transactions and a violation of Title 18, US Code § 1962(a), collection

10    of an unlawful debt and a violation of Title 15 US Code §§ 1692e, misrepresentation and 1692f,

11    unfair practices. The above-described assignment allegedly executed by a so-called MERS

12    executive was intentionally calculated to deceive the Plaintiffs and to misrepresent themselves as

13    creditors so that they could collect the mortgage debt twice, see **Exhibit D**, attached and

14    incorporated by reference. These predicate acts and activities misled the Plaintiff and were

15    designed to unlawfully obtain title to the subject property, to the detriment of the Plaintiffs and

16    they were done without reference to a lawful exercise of the lawful rights of the Defendants.

17        51. Obviously, these indisputable facts, as memorialized in the *Wall Street And The

18    Financial Crisis, Majority And Minority Staff Report, Permanent Subcommittee On

19    Investigations, United States Senate,* which Plaintiffs fully incorporate in their complaint by

20    reference, were of little concern to the Defendants because they intended to realize *enormous

21    profits so great from selling their loans to REMICs, after the loans were paid in full, as

22    substantiated by the use of the 2046 Balance Sheet and the 1099 OID form, discussed above,

23    and receiving income from mortgage insurance products that would* render such interest

24    collected on just servicing their bogus mortgage loans, negligible by comparison.

52.    Part of the reason the Defendants' multi-faceted criminal scheme has gone so largely unnoticed for such a protracted period, *is that it* victimized so many unsuspecting homeowners, created havoc on U.S. Courts, and defied the adage that "crimes do not pay" by netting hundreds of billions, if not trillions, of dollars for the perpetrators thereof, and its sophistication is beyond the imagination of average persons. *The scope and complexity of the profits from this enterprise were invisible to the average person.* Similarly, beyond the imagination of most persons was, and is, the scope of the DISHONESTY of the Defendants and those acting in furtherance of their multi-faceted criminal enterprise, including the present Defendants themselves.

53.    Since its inception in 1999 or thereabouts through the present time, persons acting within the ambit of the Defendants' unprecedented RICO conspiracy, most particularly the Defendants herein, continued to operate consistently with the core principles of dishonesty and *obfuscation, which was* engendered by the original conspirators, among them the dubious duo, GMAC MORTGAGE, LLC and US BANK, NA.

54.    The dark influences of this dubious duo have been spreading throughout the financial services, lending and banking industries into the national economy and beyond, threatening the very economic stability of the United States, if not that of the whole world.

55.    Because of the threat of continuing criminal acts of fraud and deception, the Defendants' past and present conduct in falsifying millions of mortgage artifices in furtherance of their multi-faceted enterprise, and that most of their claims in foreclosure cases have been based on intrinsic fraud, Plaintiffs urge this Honorable Court in the strongest possible way to apply a presumption of FALSITY when reviewing any documentary evidence filed or presented in any legal proceeding by any of the Defendants. *The threat of continuing criminal acts related to the Plaintiff's loan documents and probable foreclosure makes this foreclosure an open-ended*

*pattern of racketeering activity that was started at least as far back as November of 2008 and continues to the present. The actions taken by the Defendants, and all of them constitute a series of predicate acts, including a fraudulent Assignment of Deed of Trust scheme, fraudulent demands for payment that constitute a pattern of racketeering activity that are related by a common purpose and actions taken by an association-in-fact enterprise, and those working under US BANK, NA, OCWEN LOAN SERVICING, LLC and DITECH FINANCIAL, LLC or at the direction of US BANK or subsidiaries and agents. The common purpose involved in each of the predicate acts is to create an artifice of flawed and fraudulent documents to give the appearance that OCWEN LOAN SERVICING, LLC, in the case of the Dale Young property described above, has the standing to enforce the note and deed of trust executed by the Plaintiffs with HOMECOMINGS FINANCIAL, LLC, and to subsequently collect the mortgage payments even though they are not entitled to collect monthly mortgage payments. They subsequently initiated a foreclosure process on the plaintiff's home even though none of these banks and Defendants have any connection to the note and deeds of trust executed with HOMECOMINGS FINANCIAL, LLC, and they lack a chain of title to the note and deed of trust and they lack a property interest in the note and deed of trust. Thus the defendants cannot foreclose and cannot exercise any legitimate powers of enforcement of the note and Deed of trust.*

56.    Such a presumption is not just warranted; it is indeed compelled by the extent to which the Defendants, and those with whom they are associated, have long been acting in a malicious and wanton manner turning the truth into a lie in most documents filed or presented in U.S. Courts, evincing complete contempt for the judicial process itself, and shamelessly disregarding the rights of persons having interests contrary to their own. *The documentation of the fraudulent paperwork has come from the officials of the various County Recorders Offices nationwide, some of whom have conducted research and commissioned studies on the fraud and*

*violation of the law. This includes Phil Ting, the County Recorder in San Francisco, who commissioned a study by a Respected Southern California Research firm AEQUITAS, who published their research in a Report called Foreclosure in California, a crisis of compliance, in which they showed that the banks violated the law 84% of the time when they foreclosed on homes. It appears that the banks have exercised undue influence over the state courts because these unlawful practices are being ignored by the state court judges.* Plaintiffs' foregoing characterization is particularly true because the Defendants' continued contempt for due process, procedural due process, and other applicable constitutional protections, is compounded by their specific intention to obviate the longstanding traditional requirement that documents prepared for legal use be truthful, authentic, and legitimate.

### III.    JURISDICTION AND VENUE

57.    This Honorable Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964. Jurisdiction may also be conferred based on diversity or supplemental jurisdiction, and the holdings of the U.S. Supreme Court in <u>Tafflin v. Levitt</u>, 493 U.S. 455 (1990), and the U.S. Court of Appeals for the Ninth Circuit in <u>Lou v. Belzberg</u>, 834 F.2d 730, hn. 4 (9th Cir. 1987). (State courts have concurrent jurisdiction of civil RICO claims). *Defendants have engaged in interstate commerce through fraudulent and deceptive lending practices across state lines in the matters described below, in violation of the laws of the United States and Maryland. As a result, the racketeering activity involved interstate commerce.*

58.    Venue is proper in this judicial district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Defendants are subject to personal jurisdiction in this judicial district and have done business in this district or in some cases reside in this district. Note that Section 1965(b) of the Federal RICO Act provides that process may be served in "any judicial district of

the United States" when required by the "ends of justice." Courts have held that such "nationwide service of process" provisions also confer personal jurisdiction over a defendant in any judicial district as long as the defendant has minimum contacts with the United States. Finally, the statute provides a right of action by any injured party.

59.    Section 1962(c.) and (d) of the Federal RICO Act creates a private right of action for any "person" who has suffered a compensable injury. The term "person" has been interpreted liberally to include natural persons, partnerships, joint ventures, corporations, and governmental entity suing for its own injuries. Plaintiffs have been injured in their business and property by the Defendants' illegalities; therefore, we, the Plaintiffs bring this civil action against the Defendants, their co-conspirators, and unknown co-conspirators for the fraudulent and deceptive practices they have been perpetrating, pursuant to their multi-faceted criminal enterprise as follows:

IV.    THE DEFENDANTS' MORTGAGE LOAN SECURITIZATION SCHEME RELATIVE TO THE SUBJECT PROPERTY

60.    In the past ten (10) years, millions of residential mortgages have been bundled together, often in groups of 5,000, and investors were offered the opportunity to buy shares of each bundle.

61.    Each bundle of residential mortgages was given a name, such as "XYZ Home Loan Trust 2000 ABC-2." The name indicates the information about the particular trust such as the year the trust was formed (2000) and its contents (with ABC indicating by whom the loans in that particular trust were originally made).

62.    The Home Loan Trust has a Pooling and Servicing Agreement (Also known as

PSA). The PSA sets forth what happens after the mortgages are bundled together. The PSA also sets a Cut-off Date. The Cut-off Date is the date on which all the mortgage loans in the trust must be identified. In short, a final list of all the mortgage loans in the trust is set out.

63.     Under the PSA, the Originator sold the bundle of mortgage loans to an entity known as a "Depositor." The Depositor then sold the bundle of mortgage loans to an "Underwriter," the company that issues the certificates that show that the investors hold a beneficial interest in the trust. In short, the mortgage loans are gone from the Originator to the Depositor to the Underwriter of the Trust.

64.     Each trust has a closing date, which is the date that the individual mortgages are transferred to the Trust Custodian, who must certify that for each mortgage, the custodian has a mortgage note and/or proof that the ownership of the note has been transferred. This proof is most often an Assignment of mortgage or deed of trust. Most trusts include the following or equivalent language regarding the Assignment: "Assignments of the Mortgage Loans to the Trustee (or its nominee) will not be recorded in any jurisdiction, but will be delivered to the Trustee in recordable form, so that the mortgage loans can be recorded in the event recordation is necessary in connection with the servicing of a Mortgage Loan."

65.     Some of the mortgage loans in the Home Loan Trust, also known as a REMIC, inevitably go into default and eventually foreclosure. The Trustee claims in the foreclosure action that it has acquired the loan from the Originator. However, the Trustee never mentions the intervening transfers (i.e., the many times that the said loan has been sold to other parties), and never proves that such transfers lawfully occurred. In the rush to form these trusts and sell them to investors, or in a deliberate attempt to cheat investors, the Assignments were never prepared, filed, and recorded. However, the Defendants' failure to prepare, to file, or record the

Assignments, according to the PSA, *means that the entity seeking foreclosure can never prove the chain of ownership and title to the note and deed of trust of mortgage*. The homeowner has no idea that he is corresponding with, negotiating with, or making his loan payments to a loan servicer instead of the owner of the loan himself. More despicably, the Homeowner is NEVER involved either in the formulation of the "Unconscionable" REMIC nor the "Undisclosed" Securitization Process that technically turns over the security interest in his property to other parties, and, even more egregiously, his name and property are NOT even mentioned in either the PSA itself and/or other relevant securitization documents. And, to compound the malfeasance, the Homeowner has not even signed the Securitization Documents themselves and never read and/or negotiated the terms of the Deed of Trust that assigns all the profits to the Defendants and the losses to the homeowner.

66.    Under the purported securitization process, in which the name, signature, and property address of the homeowner are excluded, as long as the homeowner was making his mortgage payments in a timely manner, all was well. However, when widespread defaults started occurring in 2007 or thereabouts, the Trustees, Loan Servicers, and the Attorneys began to discover in the foreclosure process that the original Assignments could not actually be located, or that certain states, like Massachusetts, did not allow blank Assignments or Assignments with retroactive effective dates as valid assignments supporting a documented chain of title. To solve the problem of missing Assignments, which rendered those mortgages fatally flawed because of the bifurcation of the note, the trustees, their attorneys, and loan servicers began to fabricate and file new Assignments. These new Assignments were signed and notarized in an attempt to reverse engineer the assignments, and fabricate a chain of title years after the assignments were required to be recorded, as required under Title 26, USC, §§ 860D and 860G. These statutes place an absolute requirement for the REMIC to assign the mortgages and deeds of trust within

90 days of the start up date of the REMIC, which did not occur. The assignments occurred many years after they were required to be made under the statutes. This made the assignments appear in the county records many years after the actual transfers were required to take place in contravention to the Supreme Court ruling in Carpenter v. Logan, 83 U.S. 271 (1872) - that declares the Deed of Trust or mortgage a nullity without the Note.

67.     Those fraudulent Assignments were being prepared by specially-selected firms and companies that specialize in providing "mortgage default services" to banks and mortgage servicing companies. For instance, in Florida, a state with a high mortgage default rate, more than 80 percent of the Mortgage Assignments filed in the last three years had been prepared, filed, and notarized by the same five or so law firms and default processing companies. From Florida, and other States such as California and Nevada, the fraudulent practice proliferated into a national phenomenon wrecking havoc on millions of homeowners and the U.S. court system of every state, especially Maryland, with non-judicial foreclosure laws.

68.     An Assignment was prepared, notarized, and filed by mortgage servicers to purportedly cure the missing assignment, which rendered millions of mortgages null, void, or unenforceable, if not null, void, or unenforceable ab initio. The first assignment was prepared in the name of one entity as "nominee" for the particular bank or mortgage servicing company. When the first entity's authority to file foreclosures and assignments was challenged by a court, another assignment was prepared in the name of the second entity.

69.     In all these cases, as described above, the assignment was prepared, and is prepared nunc pro tunc: to conceal the actual date that the property was originally acquired by the Trust. A close examination of the Assignments filed showing the grantee as the Trust — such as "XYZ Home Loan Trust 2006 — ABC 2" — shows that most of these Assignments were

prepared, notarized, and filed between 2008 and 2009, when, in reality, the mortgages and Assignments were actually assigned prior to the closing date of the Trust, which is noted in the PSA. While the actual closing date of the Trust can only be determined by looking at the trust or securitization documents themselves, any Trust that includes the year 2005, or any other year in its title, actually closed in 2005 or in the particular year noted in its title.

70.     Therefore, if a Mortgage Assignment is dated, executed, notarized, and filed in a year after the year set forth in the name of the REMIC on the Assignment, it is actually an Assignment specially, and in most cases, fraudulently, made nunc pro tunc — or now for then — to facilitate an unlawful foreclosure by a non-party mortgage servicer.

71.     These Specially-Made Assignments have wreaked havoc on every level of the US judicial system. In most cases, these fraudulent Assignments are dated AFTER the foreclosure action has been initiated, making it appear that the Trust somehow magically knew prior to the fabrication of the Assignment that it would acquire the defaulting property several months after the foreclosure action had been initiated.

72.     Repeatedly, courts have asked Trustees to explain why they were acquiring non-performing loans and whether such acquisition was in violation of the trustee's fiduciary duty to the Trust. Thus far, no trustee has ever come forth to explain that the Trust actually acquired the loan years before the assignment.

73.     In short, according to the U.S. Securities and Exchange Commission ("SEC"): "Mortgage-backed securities ["MBS"] are debt obligations that represent claims to the cash flows from pools of mortgage loans, most commonly on residential property.  Mortgage loans are purchased from Defendants, mortgage companies, and other originators.  These mortgage

loans are later assembled into pools by governmental, quasi-governmental, or private entities. The entity then issues securities that represent claims on the principal and interest payments made by borrowers on the loans in the pool. This process is known as securitization." SEC, "Mortgage-Backed Securities" (June 25, 2007) (http://www.sec.gov/answers/mortgagesecurities.htm).

74.     Under Maryland's and federal consumer-protection laws, the Defendants are prohibited from engaging in unfair or deceptive practices with respect to consumers as to the securitization of their mortgage loans into trusts.

75.     In the course of their securitization of Plaintiffs' mortgage loan relative to the subject properties, the loan was originated for Plaintiffs' Property on March 10, 2008, in the name of the loan originator, HOMECOMINGS FINANCIAL, LLC, and they apparently assigned said mortgage to, GMACM Home Equity Loan Trust 2006 HE-4, as discussed above, HOMECOMINGS FINANCIAL, LLC, ceased operations and has been out of business since 2013 when they filed for Chapter 11, bankruptcy.

76. The Depositor of the above REMIC apparently purchased the loan and proceeded to create the above named REMIC to position the REMIC as an investment trust, to contrive a transfer of Plaintiffs loan into a securitization scheme under the false pretenses of a REMIC. There has never been a chain of title from the original lender to the above named REMIC. In addition, they bifurcated the Note from the Deed, thus rendering it null or void ab initio, according to the U.S. Supreme Court, in Carpenter v. Longan, 16 Wall. 271, 83 U.S. 271, 21 L.Ed. 313 (1872), and used Plaintiffs' Promissory Note as a deceptive, manipulative, and fraudulent device in contravention to securities fraud laws by duplicating and selling, and allowing other co-conspirators to duplicate and sell the said Promissory Note repeatedly to known and countless unknown co-conspirators to the benefit of Defendants' enterprise and that

of the Defendants' co-conspirators respective enterprises. The note was assigned to GMAC MORTGAGE, LLC and the Deed of Trust was assigned to OCWEN LOAN SERVICING, LLC.

77. The Plaintiffs discovered the multiple and serial assignment of the loan to REMICS, from the responsive letter I received from one the several loan servicers that was assigned to my loan. The admitted that my loan was assigned to a REMIC called GMACM Home Equity Loan Trust 2006 HE-4, see **Exhibit C,** attached and incorporated by reference. The Defendants created a sham deed of trust and cloaked the failed and "Undisclosed Securitization" of their loan, a process in which Plaintiffs did not participate, and was done without their consent. The Depositor, Residential Asset Mortgage Products, Inc. and agents, failed to assign Plaintiffs' mortgage loan for the Dale Young property into the Securitized Trust before the Cut-off date in contravention to the PSA, and in violation of Title 26 US Code, §§ 860D and 860G, thereby rendering such transfer ineffective and void. It was also void, since the 2046 Balance Sheet and the 1099 OID form had been issued by then, which documented the fact that the loan was paid in full. The Defendants used documents related to the foreclosure, particularly the Substitution of Trustee and an Assignment of Deed of Trust with a signature of alleged agents of the original lender that were executed after the original lender, HOMECOMINGS FINANCIAL, LLC, ceased operations and has effectively shelved their operations, laying off many of their employees and could not have granted permission to the document signers to act as an agent under a power of attorney at the time that the assignment was executed, because of the bankruptcy filing of HOMECOMINGS FINANCIAL, LLC discussed above. The Defendants, with respect to the Dale Young Property attempted to use an Assignment of Deed of Trust, which is a nullity absent of a Corporate Resolution, Power of Attorney, court order from the bankruptcy judge or other supporting documentation.

78. They attempted to use as foreclosing entity, a law firm in Maryland, BWW LAW GROUP, LLC to execute and file other deceptive foreclosure documents, such as the Substitution of Trustees, in contravention to the provisions of Plaintiffs' Security Instrument. At the time that these documents were executed neither OCWEN LOAN SERVICING, LLC, nor US BANK nor any of the Defendants was the true owner of the loan because its chain of ownership had been broken by a defective transfer of, and/or failure to transfer, the mortgage loan to the securitized trust as discussed above. Also it was fraud to transfer the loan after it had been paid in full as documented by the 2046 Balance Sheet, and the 1099 OID discussed above.

79. The Defendants then attempted the failed transfer after the closing date of the securitized trust holding the pooled mortgages and therefore the transfer was ineffective. More significantly, the signer of the Substitution Of Trustee, and the signer of the Assignment of Deed of Trust, is not authorized to execute said documents because Plaintiffs' Security Instrument confers the right to substitute the trustee exclusively to the purported Lender/Beneficiary, which was HOMECOMINGS FINANCIAL, LLC, which was a corporation that ceased operations in 2013, about one year before the time of the signing of the Assignment of the Deed of Trust. The Defendants attempted to use a foreclosing entity, which is not authorized to accelerate said mortgage or foreclose on said mortgage loan as the Security Instrument confers the right of acceleration exclusively to the purported Lender/Beneficiary, which is HOMECOMINGS FINANCIAL, LLC, a bankrupt entity, at the time the two Assignments of Deed of Trust were executed, as discussed above.

80. The Trustee assigned the note thereof in blank or without an assignee and bifurcated it from the Deed of Trust, thereby rendering the said note void ab initio pursuant to the U.C.C. and the Supreme Court ruling in Carpenter v. Logan as previously mentioned, that calls for the Note to be affixed to the Deed of Trust as if the two Documents were one. The Defendants failed

to deliver the Note to the Trustee as required under UCC §3-203 (a) An instrument is transferred when it is delivered by a person other than its issuer for the purpose of giving to the person receiving delivery the right to enforce the instrument, and under subsection (b) Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any rights of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument."

81. The Defendants, by bifurcating the note, have violated this U.C.C. provision and the doctrine of clean hands by engaging in intrinsic fraud again and again…all their illegalities also in contravention to the U.S. Supreme Court, in Carpenter v. Longan, 83 U.S. 16 Wall. 271 271 (1872), that held, "The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity." Therefore, the Defendants never did, and can never, acquire rights of a holder-in-due-course by the transfer, directly or indirectly, from the holder in due course.

82. To compound their fraudulent scheme, the Defendants later demanded and collected monthly payments, late charges, and other fees — to which they are not entitled, after assigning or selling the so-called mortgage loans to countless entities, known and unknown, collecting their face values time and time again under the terms of multiple insurance policies, including the CREDIT DEFAULT SWAPS, aka CDS, government-sponsored insurance, and other private insurance policies that, supplied the Defendants US BANK, US BANK, OCWEN LOAN SERVICING, LLC and the enterprise, with multiple sources of payment in full of the subject loan, so that any attempt to collect further payments of the loan from the Plaintiffs and their ongoing pursuit of a foreclosure is an attempt at double recovery. These various forms of

insurance protected the Defendants from all losses from loan default, and perpetrated other criminal acts that deprive homeowners of their property, in the form of the monthly mortgage payments paid to the Defendant US BANK, and the subsequent foreclosure process, which further deprives the Plaintiff of his home. Neither US BANK, nor DITECH FINANCIAL, LLC nor OCWEN LOAN SERVICING, LLC is entitled to receive the monthly mortgage payments because they are not creditors, as discussed, and such actions to collect mortgage payments, as non-creditors, and to subsequently foreclose are all predicate acts of racketeering activity that involved careful planning, a systematic operation and ongoing management with the intent to deceive the Plaintiffs regarding their falsified status as creditors. This violates Federal Civil Rico law and, primarily, the Fourth, Fifth, and Fourteenth Amendments of the U.S Constitution, and the Supremacy Clause thereof, that guarantee Plaintiffs' right to be secure in their property, and protect their property from unreasonable seizure.

## FIRST CAUSE OF ACTION

**Conduct and Participation in a RICO *Enterprise***

**Through a *Pattern of Racketeering Activity*:**

**(18 U.S.C. §§ 1961(5), 1962(c))**

**AGAINST ALL DEFENDANTS**

83.     Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

84.     At various times and places partially enumerated in Plaintiffs' complaint, all Defendants were "persons" as defined by 18 U.S.C. §1961[3]. Defendants engaged in a pattern

of racketeering activity by the series of related predicate acts that formed the basis for the racketeering activities through their enterprise, an association-in-fact.

85.    At various times and places partially enumerated in Plaintiffs' complaint, all Defendants did associate with a RICO *enterprise* of individuals and corporations, who were associated in fact, and who engaged in, and whose activities did affect, interstate and foreign commerce.

86.    Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO *enterprise* through a *pattern of racketeering activity*, all in violation of 18 U.S.C. §§ 1961(4), (5), (9), and 1962(c).

87.    During the ten (10) calendar years preceding December 1O, 2014, all Defendants did cooperate, jointly and severally, in the commission of two (2) or more RICO predicate acts that are itemized in the RICO laws 18 U.S.C. §§1961 (A) (B), and did so also in violation of the RICO law at 18 U.S.C. 1962(c) (Prohibited activities).

88.    Plaintiffs further allege that all Defendants did commit two (2) or more offenses itemized above at in a manner which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of the RICO law at  18 U.S.C. 1962(c) supra.

89.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be *liberally* construed by this Honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  *Respondeat superior* (as explained above).

**The Predicate Acts**

90.     Defendants' systematic scheme to fraudulently conceal assessment of unlawfully marked-up fees on the accounts of borrowers who have mortgage loans administered by the Defendants, as described above, which was facilitated by the use of United States Mail and wire, constitutes "racketeering activity" within the meaning of Title 18 USC 1961(1) as acts of mail fraud and wire fraud under Title 18 USC 1341 and 1343, respectively and as an act of engaging in extortionate credit transactions in violation of Title 18 USC §891-894.

91.     In violation of Title 18 USC sections 1341 and 1343, the Defendants utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by them by obtaining money from borrowers using false or fraudulent pretenses. In addition, the Defendants attempted to collect a debt that is not owed to them and to foreclose on the Plaintiffs primary residence without standing and at the same time collected a claim for a mortgage insurance policy, see **Exhibit B**, attached and incorporated by reference.

92.     Through the mail and wire, Defendants provided mortgage invoices, loan statements, or proofs of claims to Plaintiffs, demanding that Plaintiffs and other borrowers pay fraudulently concealed marked-up and/or unnecessary fees for default-related services.

93.     Defendants fraudulently and unlawfully marked-up fees in violation of borrowers' mortgage agreements because the fees exceed the actual cost of the services, and therefore, they are not, as the mortgage agreement require, "reasonable" or "appropriate" to protect the note holder's interest in the property. Defendants' assessment of fees that were unnecessary are also unlawful because unnecessary fees are not, as the mortgage agreement require, "reasonable" or "appropriate" to protect the note holder's interest in the subject property.

94.     The mortgage invoices, loan statements, or proofs of claims provided to borrowers fraudulently concealed the true nature of assessments made on borrowers' accounts.

Using false pretenses, identifying the fees on mortgage invoices, loan statements, or proofs of claims only as "Lender Placed Insurance," "Other Charges," "Other Fees," "Miscellaneous Fees," or "Corporate Advances" to obtain full payments from borrowers, Defendants disguised the true nature of these fees and omitted the fact that the fees include undisclosed mark-ups and/or were unnecessary.

95.    Furthermore, to lull borrowers into a sense of trust, the Defendants concealed Defendants' unlawful fees, in order to dissuade borrowers from challenging Defendants' unlawful fee assessments, Defendants further conceal their scheme from borrowers by telling them, in statements and other documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that they are "[i]n accordance with the terms of your mortgage." The Defendants US BANK, NA also charged an interest rate that was far in excess of the stated interest rate and finance charges that are far in excess of the stated finance charges.

96.    Each of these acts described above constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

97.    The Defendants used the internet, telephone, and facsimile transmission to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, Defendants engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

98.    In an effort to pursue their fraudulent scheme, Defendants knowingly fraudulently concealed or omitted material information from plaintiffs. Defendants' knowledge that their activities were fraudulent and unlawful is evidenced by the fact that they did not disclose the mark-ups and/or unnecessary nature of the fees in their communications to Plaintiffs and borrowers. They also did not give notice of the date that they filed the mortgage insurance claim and collected money from said claim.

99.     Additionally, the Defendants, directly or indirectly, engaged in thousands of acts and threats that are chargeable under provisions of title 18 USC, including, but not limited to, section 659 (relating to theft from interstate shipment and fraud and related activity in connection with access devices); section 1344 (relating to financial institution fraud); section 1951 (relating to interference with commerce, robbery, or, extortion); section 1952 (relating to racketeering); section 1956 (relating to laundering of monetary instruments, including Promissory Notes and other Mortgage Artifices; engaging in monetary transactions in property derived from specific unlawful activities); sections 2314 and 2315 (relating to interstate transportation of stolen property) and engaging in an act involving extortionate credit transactions in violation of Title 18 USC §891-894.

100.     The Defendants, directly or indirectly, have also been engaging in numerous acts and threats that are chargeable under provisions under State law punishable by imprisonment for more than one year; acts that are indictable.

102.     The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Tile 18 USC 1961(5) in which Defendants have engaged under Title 18 USC section 1962(c).

103.     All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Defendants' racketeering enterprise.

104.     The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Honorable Court enjoins the racketeering activity.

105.     Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

106.     As a direct and proximate result of these violations of Title 18 USC section

1962(c), Plaintiffs have suffered damages. Defendants are liable to Plaintiffs for treble damages, together with all costs of this action, plus reasonable attorneys' fees, as provided under Title 18 USC seciton1964(c).

107.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be liberally construed by this Honorable Court.  Said construction rule was never codified in Title 18 of the United States Code, however.  Respondeat superior (as explained above).

SECOND CAUSE OF ACTION

**Conspiracy to Engage in a**

***Pattern of Racketeering Activity*:**

**(18 U.S.C. §§ 1961(5), 1962(d))**

**Against all Defendants**

**108.    Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.**

109.    At various times and places partially enumerated in Plaintiffs' complaint, all Defendants were "persons" as defined by 18 U.S.C. §1961[3].

110.    At various times and places partially enumerated in Plaintiffs' complaint, all Defendants did conspire to acquire and maintain an interest in a RICO *enterprise* engaged in a *pattern of racketeering activity*, in violation of 18 U.S.C. §§ 1962(b) and (d).

111.    At various times and places partially enumerated in Plaintiffs' complaint, all Defendants did also conduct and participate in said RICO enterprise through a pattern *of*

1  *racketeering activity*, in violation of 18 U.S.C. 1962(c) and (d). See also 18 U.S.C. §§ 1961(4)

2  (5) and (9).

3

4  112.    During the eight (8) calendar years preceding December 10, 2014, all Defendants,

5  did cooperate, jointly and severally, in the commission of two (2) or more of the predicate acts

6  that are itemized at 18  §§ 1961(1) (A) an (B), in violation of 18 U.S.C. 1962(d).

7

8  113.    Plaintiffs further allege that all Defendants did commit two (2) or more offenses

9  itemized above in a manner, which they calculated and premeditated intentionally to threaten

10  continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of

11  18 U.S.C. 1962(d). (Prohibited activities supra).

12

13  **114.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized**

14  **above are to be *liberally* construed by this Honorable Court. Said construction rule was**

15  **never codified in Title 18 of the United States Code, however. *Respondeat superior* (as**

16  **explained above).**

17

18  THIRD CAUSE OF ACTION

19  CIVIL RACKETEERING

20

21

22  **AGAINST ALL DEFENDANTS**

23  (18 U.S.C. § § 1961(5), 18 U.S.C. 1962(a) and 18 U.S.C. 1962(c), 1503)

24  115.    Plaintiffs incorporate by reference in this cause of action each and every

25  allegation of the preceding paragraphs, with the same force and effect as though fully set forth

26  herein.

27

28

116.     At various times and places partially enumerated in Plaintiffs' complaint, all Defendants were "persons" as defined by 18 U.S.C. §1961[3].

117.     At various times and places partially enumerated in Plaintiffs' complaint, all Defendants did associate with a RICO enterprise of individuals who were associated in fact, and who engaged in, and whose activities did affect, interstate and foreign commerce.

118.     Likewise, all Defendants did conduct and/or participate, either directly or indirectly, in the conduct of the affairs of said RICO enterprise, an association-in-fact, *through a pattern of racketeering activity*, all in violation of 18 U.S.C. §1961(4), (5), (9), and 1962(c), 1503.

119.     During the eight (8) calendar years preceding May 13, 2014, all Defendants, did cooperate, jointly and severally, in the commission of two (2) or more of the RICO predicate acts that are itemized in the RICO laws at .§1961(1), (A), (B), and did so in violation of the RICO laws at 18 U.S.C. §§1962(c) 1503 (Prohibited activities).

120.     Plaintiffs further allege that all Defendants did commit two (2) or more offenses itemized above in a manner, which they calculated and premeditated intentionally to threaten continuity, i.e., a continuing threat of their respective racketeering activities, also in violation of 18 U.S.C. 1962(c) 1503 supra.

121.     The conduct of the members of the enterprise, an association-in-fact, which is a coordinated and planned operation of the enterprise using all of the Defendants, with assigned tasks and the Defendant's specialized skills and expertise of the Defendants as it relates to the

illegal scheme, is for the most part directed by the syndicates referenced in detail in this entire complaint.

122.    This is the structure of the enterprise as it relates to the "money-in" component of the illegal scheme, as also set forth in this complaint.

123.    The Defendants orchestrated the siphoning of the stolen money in direct consultation and Association with terrorists, drug cartels, and unsourced money entities according to the Senate Report on *U.S. Vulnerabilities to Money Laundering, Drugs, and Terrorist Financing: HSBC Case History.*

124.    All Defendants as members of the enterprise, directly or indirectly, are participants in the illegal multi-faceted scheme in different capacities, functions, and roles calculated to enrich and expand the Enterprise so that it could continue to perpetuate its criminal activities against Plaintiffs and hundreds of thousands of similarly-situated homeowners nationwide.

125.    The enterprise governance occurred through frequent communications among its members by means of interstate and international wire communications via telephone, facsimile, Email, and other methods of communications, in interstate and foreign commerce, in additional to travel to and from California, Maryland, Virginia and internationally, and other acts of lawlessness and malfeasance.

126.    The predicate acts form "a *pattern of racketeering activity*" and are all part of a common criminal plan in furtherance of, and to perpetuate, the Defendants' multi-faceted criminal scheme, clustering around, *inter alia,* the deceptive mortgage loan origination,

processing, and securitization of said mortgages into a trust also known as a REMIC, unfair mortgage loan servicing practices; concealment of parties with constitutional standing and party-in-interest-status in millions of mortgage loans; intrinsic mortgage fraud by fabricating and filing of millions of mortgage artifices under the penalty of perjury to give the illusion of standing in millions of foreclosure and bankruptcy proceedings, including the foreclosure on the Plaintiffs home; prosecution of hundreds of thousands of unlawful judicial and non-judicial foreclosure cases nationwide, including attempted foreclosure on the Plaintiff's home; fraudulent mortgage loan modification and mitigation processes, including fraudulent loan modification on the Plaintiffs home; overcharging of foreclosure-related fees for services rendered including fraudulent overcharging for fees under the Plaintiff's home loan; charging homeowners' accounts for services not rendered including the Plaintiffs home loan account; notarial fraud; and substantial interference with the property rights and interests of Plaintiffs, including fraudulent notarizations on documents recorded and related to the Plaintiffs home loan in contravention to the Fourth Amendment of the Constitution of the United States of America which guarantee, inter alia, "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."

127.    All the above-mentioned acts and criminal conduct of the Defendants are designed to enrich the Enterprise. In addition to being part of a common criminal scheme, as alleged above, the predicate acts of the Defendants are interrelated, in that thy are part of a multi-faceted criminal scheme, and share at least eighteen (18) other distinguishing characteristics in that they: (i) were mortgage loans originated by HOMECOMINGS FINANCIAL, LLC, an entity that was no longer in operation; (ii) have missing and/or non-existent promissory notes and assignments; (iii) have already been assigned, transferred, or previously sold to investors in an

1    international Ponzi Scheme; (iv) have been assigned to multiple trusts; (v) have been paid time

2    and time again under the terms of multiple insurance policies, FHA, the CDS or policies that

3    indemnify their lender from all losses, including non-payment of, and default on, loan; (vi) were

4    not properly assigned, or originally assigned in blank in violation of UCC 3-110; (vii) were not

5    assigned to the securitized trust before the cut-off date in the PSA; (viii) contain the same

6    fraudulent assertion as to, in the case of the Dale Young Property, OCWEN LOAN

7    SERVICING, LLC which was identified as being the beneficiary with standing when indeed

8    OCWEN LOAN SERVICING, LLC has never been the beneficiary thereof (ix) in the case of the

9    Dale Young property, contain similar language as to The OCWEN LOAN SERVICES, LLC

10   being HOMECOMINGS FINANCIAL, LLC's successor without any such evidence or, in the

11   alternative, evidence that indicates otherwise; (x) being claimed by parties with no legal standing

12   to demand money and foreclose on the property at bar; (xi) involve fraudulent substitutions of

13   trustee and assignments; (xii) contain backdated assignments, deeds of trust, and other mortgage

14   artifices executed by robo-signers or third-parties with no material knowledge of the contents

15   thereof; (xiii) contain other fake documents executed or notarized by robo-signers using fictitious

16

17   corporate titles; having been executed and notarized fraudulently under the penalty of perjury;

18   (xiv) assignments signed by officers of the grantee fraudulently identifying themselves as

19   officers of the grantor; (xvi) employment of fake documents, false officer titles, and forged

20   signatures violative of federal and state lending laws, and state notary fraud laws; (xvii) brought

21   by US BANK, OCWEN LOAN SERVICING, LLC and other criminal enterprise members;

22

23   (xviii) and have as moving parties individuals, managers, network attorneys, law firms or

24   foreclosure mills associated with RICO Defendant US BANK, NA, SECURED

25   IMPROVEMENTS, LLC and OCWEN LOAN SERVICING, LLC.

26

27

28

128.    The Defendants have concealed the stolen property and other criminally derived proceeds of the illegal scheme since the aforementioned date upon which (a) foreclosure laws related to assignments had been broken and (b) the TARP program crossed the line of illegality and began being utilized for their profit individually and collectively until the present time. This concealment has continued unabatedly and in the face of reports by the FDIC, the Comptroller of the Currency, the Office of the Thrift and the United States Department of Homeland Security, and the Report of the Inspector General of the TARP program, in the only manner in which such concealment could continue in the face of contrary reports by various sources: Through lies told directly from the mouths of the Defendants and Enterprise Members and has been repeated even by Government Officials and the media in order to misrepresent the true facts to Plaintiffs and the citizens of the United States and their elected representatives.

129.    As American citizens have become knowledgeable of the foregoing scheme, the Defendants — and each of them — have engaged in extrinsic mortgage fraud and conversion in violations of State and Federal law, other acts chronicled as wrongful by the Office of the Inspector General of the Securities and Exchange Commission, and other Governmental Agencies.

130.    All of the predicate acts relate to one another because they represent a common scheme to further the illegal scheme, to hide the true parties of interest under the terms of millions of promissory notes, minimizing losses and maximizing profits, thereby defrauding hundreds of thousands of American citizens, including Plaintiffs, to enrich the Defendants individually, and their Enterprise collectively.

131.    The predicate acts progressed in a logical fashion as the illegal scheme expanded from Maryland to other states and nations, supported by monies advanced to it even by drug cartels, terrorists, and the conversion of personal and real property of countless US citizens, including Plaintiffs, misappropriation of taxpayers' bailouts — from which RICO Defendants have received nearly billions of dollars, and ultimately Defendants' raid of the TARP Programs, and monies from other unknown sources with all Defendants herein assuring that all the Defendants, unknown and known, would have plausible deniability and governmental immunity from criminal prosecution through utilization of the foregoing fraudulent techniques often used by persons in power to corruptly stop enemies from exposing the truth.

132.    These acts of the Defendants, and each of them, including the use of fraudulently conveying and transferring money, constitute repeated and related predicate acts of . . . [i] money laundering in violation of 18 U.S.C. §1956; [ii] engaging in monetary transactions in property derived from specific unlawful activity in violation of 18 U.S.C. §1957; [iii] wire fraud in violation of 18 U.S.C. §1343; [iv] financial institution fraud in violation of 18 U.S.C. §1344; [v] mail fraud in violation of 18 U.S.C. §1341; [vi] interstate or international travel in violation of the travel act, 18 U.S.C. §1952; [vii] and an act of engaging in extortionate credit transactions in violation of Title 18 USC §891-894. The fact is that the objects of the fraud for purposes of this claim for relief worsened and increase liability to the Defendants. These facts create additional liability under 18 U.S.C. §1503.

133.    The multi-faceted criminal scheme would not have continued absent the influx of money provided by the Defendants' illegal schemes, directly or indirectly, as alleged in detail above, as well as their money laundering and drug cartel influxes of money also alleged above. The effect of the collapse of the foregoing money laundering and racketeering schemes is a

matter of public record and a fact which this court can take judicial notice including the recent Senate Report on the money laundering and drug cartel activities of HSBC and resulting admission by Defendant Holder in his official capacity that such unlawful money laundering activities have spread to all banking institutions in the United States, including US BANK and other Co-defendants, and their offshore haven defendants. Defendants, directly or indirectly, used and exploited U.S. Financial institutions, lawyers, accountants in California, New York, Virginia, Maryland as well as interstate and internationally via telephone, facsimile, Email, wire transfer, and other methods of communications from 1999 or thereabouts until the present.

134.    As a direct and proximate result of the violations set forth above, Plaintiffs, and hundreds of thousands of similarly-situated homeowners, have been injured in their business, personal property, and in their real property and such injury is continuing.

135.    Plaintiffs are also entitled to the appointment of a receiver for an accounting to recover the fruits of the frauds, parallel injunctive relief, an order that the Defendants and their transferees (wherever located) disgorge and forfeit of all of such monies and the fruits of their fraud.  Such relief will require a finding by this Honorable Court that the acts and conduct of the Defendants, and each of them, as alleged are in violation of the Hobbs Act U.S.C. § 1951), which "prohibits actual or attempted robbery or extortion affecting interstate or foreign commerce", and conspiracy to violate the Hobbs Act (18 U.S.C. § 1951) at §371, which "proscribes conspiracy to commit robbery or extortion without reference to the conspiracy statute." These acts are also extortionate credit transactions in violation of Title 18 USC §891-894.

136.    The Defendants mentioned-above and mentioned-below, directly and indirectly, have committed "Extortion By Force, Violence, or Fear under Color of Official Right" by

demanding and actually obtaining money from, and attempting to take property, from hundreds of thousands of homeowners, including Plaintiffs, whose property is located at 1314 Dillon Court, Capital Heights, Maryland.

137.    Therefore, Plaintiffs ask this Honorable Court for a determination as to whether the activities and conduct of the Defendants, individually and collectively, as alleged above and below are violative of both the Hobbs Act (18 U.S.C. § 1951), which prohibits actual or attempted robbery or extortion affecting interstate or foreign commerce, and also conspiracy to violate (18 U.S.C. § 1951) at §371, "which proscribes conspiracy to commit robbery or extortion without reference to the conspiracy statute."

138.    Plaintiffs seek further an order halting the foreclosure of all real estate in the United States of America by any of the Defendants, until the full restitution and disgorgement has occurred in favor of Plaintiffs and against the enterprise members, which includes injunctions on any post-foreclosure activities throughout the country as well, all of which shall stop all foreclosure activity of any kind in States such as Maryland, Virginia, California, Florida, Ohio, Nevada, Colorado, New Hampshire, New York, Iowa, Wisconsin, Michigan and all other states in which the Bankers have continued their "reverse-run-on-the-bank."

139.    Plaintiffs further seek an emergency Temporary Restraining Order to take effect immediately, and even *sua sponte* in the event this Honorable Court is so inclined.

140.    The Defendants' violations of 18 U.S.C. §1962[c] and 1503, including but not limited to the double recovery discussed above, flawed and defective Assignments of the Deed of Trust, executed without authorization from the original lender and with a gap in the chain of title as discussed above, higher interest rates than are allowed under TILA, double the finance

charges that were quoted by the original lender and are the proximate cause of these losses. Under the provisions of 18 U.S.C. §1964[c], Plaintiffs are entitled to bring this action and recover herein treble damages, the cost of bringing this suit, prejudgment interest, and recoverable attorneys' fees.

141.    Pursuant to 84 Stat. 947, Sec. 904, Oct. 15, 1970, the RICO laws itemized above are to be liberally construed by this Honorable Court. Said construction rule was never codified in Title 18 of the United States Code, however. Respondeat superior (as explained above).

### FOURTH CAUSE OF ACTION

**Unjust Enrichment, Insurance Fraud, Breach of Contract, Bad Faith**
**Against all Defendants**

142.    Plaintiffs incorporate by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

143.    By their wrongful acts and omissions of material facts, Defendants were unjustly enriched at the expense of Plaintiffs.

144.    The mortgage contract between Defendants and borrowers like Plaintiffs allows DITECH FINANCIAL, LLC, US BANK, NA, OCWEN LOAN SERVICING, LLC, the law firms named, their officials, senior managers, subordinates, and agents to pay for default-related services when necessary or appropriate, and to be reimbursed by the borrower, but it does not authorize Defendants to mark-up the actual cost of those services to make a profit, nor does it allow Defendants to incur unnecessary fees.

143.    Nevertheless, Defendants mark-up the prices charged by vendors, lender-placed

1  hazard insurance, and other services rendered, often by 100 percent or more, and then, without

2  disclosing the mark-up, assess borrowers' accounts for the higher, marked-up fee so that

3  Defendants can earn a profit.

4      144.    Thus, Plaintiffs were unjustly deprived *of property in violation of RICO statutes*.

5      145.    Defendants are aware that it is improper to mark-up and/or assess unnecessary

6  fees on borrowers' accounts for default related services. Therefore, Defendants fraudulently

7  conceal these fees on borrowers' accounts, omitting any information about Defendants'

8  additional profits, by identifying them on mortgage statements only as "Other Charges," "Other

9  Fees," "Miscellaneous Fees," or "Corporate Advances." Also, the payment by the Plaintiffs for

10  mortgage insurance and the payment by the insurance carrier of a claim for mortgage insurance

11  coupled with the foreclosure constitutes double recovery, breach of contract, bad faith, insurance

12  fraud and unjust enrichment. In addition, sending out billing statements after the loan was paid

13  in full, as is proven by the use of the 2046 Balance Sheet and the 1099 OID form by the

14  Defendants supplies additional substantiation of double recovery.

15  

16      146.    Furthermore, to lull borrowers into a sense of trust, conceal Defendants' unlawful

17  fees, and dissuade borrowers from challenging Defendants' unlawful fee assessments,

18  Defendants further conceal their scheme from borrowers by telling them, in statements and other

19  documents, that such fees are "allowed by [borrowers'] Note and Security Instrument," or that

20  they are "[i]n accordance with the terms of your mortgage."

21  

22      147.    It would be inequitable and unconscionable for Defendants to retain the profit,

23  benefit, and other compensation they obtained from their fraudulent, deceptive, and misleading

24  conduct alleged herein.

25  

26      148.    Plaintiffs seek restitution from Defendants, and seek an order of this Honorable

27  Court disgorging all profits, benefits, and other compensation obtained by Defendants from their

28

wrongful conduct.

## FIFTH CAUSE OF ACTION

**DECLARATORY AND INJUNCTIVE RELIEF AS TO THE PLANNED UNLAWFUL SEIZURE OF THE PLAINTIFFS HOUSE IN VIOLATION OF THE FEDERAL AND STATE LAWS CITED ABOVE, AND IN VIOLATION OF THE PROHIBITION AGAINST DOUBLE RECOVERY IN MARYLAND.**

**Against all Defendants**

149.    All of the above Paragraphs of this complaint are hereby incorporated by reference as though fully set forth herein.

150.    Plaintiffs further ask this Honorable Court to take judicial notice of, and for a determination declaring, HOMECOMINGS FINANCIAL, LLC's mortgage loan as described in the Security Instrument to be a sham, without any basis in fact, part of a multi-faceted Ponzi Scheme, and is therefore null, void, legally unenforceable, if not null, void, or unenforceable ab initio because, *inter alia,* the Assignment of Deed of Trust for the Dale Young property occurred without an authorization from HOMECOMINGS FINANCIAL, LLC, and without a power of attorney from said original lender and was assigned when they were in bankruptcy. Therefore, the assignment of the Deed of Trust to OCWEN LOAN SERVICING, LLC, in the case of the Assignment of Deed of Trust, and the Substitution of Trustee signed by an employee of GMAC MORTGAGE, LLC claiming to be an executive of OCWEN LOAN SERVICING, LLC, in the case of the Substitution Of Trustees, was a fraud ab initio. Additional reasons include:

160.    The plain language of the Security Instruments asserts that:

**(B)**    **"Borrower"** is Dale Young ..." A borrower, however, is one who borrows money from a lender; whereas a lender is one who lends money to a borrower. However,

there is absolutely no evidence in the Security Instrument itself, the final escrow instructions, or anywhere else of any evidence of money lent by US BANK or OCWEN LOAN SERVICING, LLC in the case of the subject property, to make the lender a Lender/Beneficiary. In the alternative, there is no evidence in the Security Instrument itself, the final escrow instructions, or anywhere else of any evidence of any money borrowed by Plaintiffs to make them the Borrowers. As discussed the Assignments are void ab-initio because of flaws discussed above. Although Plaintiffs, on two separate occasions had asked Defendants, and each of them, to validate the so-called debt pursuant to RESPA 6, and other State and Federal full-disclosure Laws and Statutes, the Defendants have never provided any substantive response as to any proof that they are even the servicer of the so-called mortgage loan, entitled to enforce the provisions thereof in the name of the holder of due course, much less the holder in due course himself/itself. Plaintiffs allege that the Defendants, and each of them, are third-party entities who have banded themselves together in a multi-faceted criminal conspiracy to defraud Plaintiffs of their real property and attempt to illegally seize their real property though an unlawful foreclosure. Plaintiffs further allege that the bifurcation of the Note, which is the only evidence of the debt, from the Security Instrument renders the debt null or void ab initio per Supreme Court ruling in Carpenter v. Logan supra.

161.    The plain language of the SI asserts:

**(C)**    **"Lender"** is HOMECOMINGS FINANCIAL, LLC the Lender has ceased operations long before the filing of their bankruptcy and never sought a court order from the bankruptcy judge for relief from stay to sell the Dale Young note and Deed of Trust. However, in the case of the Dale Young Property, US BANK was not the Lender as

1   alleged above. Said suspension of operations of the original lender after the Chapter 11

2   bankruptcy filing occurred before any assignments were signed and recorded in the

3   county records making these assignments void ab-initio. The said mortgage loan is null or

4   void and the provisions thereof are unenforceable and not null and void and

5   unenforceable ab initio as discussed above.

6

7       162.    Additionally, the Defendants received mortgage insurance money from the

8   mortgage insurance carrier who paid on the Defendant's and filed a claim with said insurance

9   carrier, allowing the Defendants to receive payment from said insurance carrier from both the

10  Mortgage Insurance carrier and the pool insurance policies. The Defendants subsequently filed a

11  foreclosure action in state court without standing. Defendants purchased mortgage insurance

12  without full disclosure regarding these insurance services and yet the Defendants foreclosed in

13  order to obtain double recovery of the debt.  Plaintiffs therefore ask this Honorable Court to

14  provide declaratory and injunctive relief as follows: that the Defendants, especially US BANK,

15  DITECH FINANCIAL, LLC, and OCWEN LOAN SERVICING, LLC will be ordered to cease

16  and desist any and all actions to evict the Plaintiffs from the subject property, that the court issue

17  an order declaring the subject debt paid in full from the proceeds derived from the mortgage

18  insurance policy and that the following instruments be expunged: The Trustees Deed, the two

19  assignments of Deed Of Trust described above, the Substitution of Trustees described above and

20  any publicly recorded documents that declare that the Plaintiffs are in default.

21

22

23

24

25                          **SIXTH CAUSE OF ACTION**

26                          **Violation of the FDCPA**

27

28

**Against All Defendants**

163. All of the above Paragraphs of this complaint are hereby incorporated by reference as though fully set forth herein.

164. Comes now Plaintiff, and hereby complains and alleges that the Defendant did violate the Fair Debt Collection Practices Act, 15 U.S.C. 1692e and 1692f by providing false and misleading information by mailing a series of dunning letters throughout 2012 through 2016 by U.S.P.S. to the Plaintiff which asked for a lump sum of money.  Defendant failed to prove up the existence of a debt to which Plaintiff was liable.  Defendant failed to provide evidence to show that Defendant was a bona fide holder of a debt instrument to which Plaintiff was liable. Defendant failed to show agency for a bona fide holder of a debt instrument to which Plaintiff was liable.  Defendant further failed to show that said bona holder was also a bona fide holder of a document establishing a lien against real property owned by Plaintiff.  Defendant further failed to itemize the various charges that comprised the total amount of the alleged debt.  Defendant failed to clearly and fairly communicate information about the amount of the alleged debt to Plaintiff.  This includes how the total amount due was determined if the demand for payment includes add-on expenses like attorneys' fees or collection costs, this in violation of 15 U.S.C. 1692(e).  Defendant used false, deceptive and misleading representations in connection with collection of any debt, 15 U.S. C § 1692e.  By demanding payment of a debt Plaintiff did not owe and by making direct, indirect, and valid threats of dire consequences to Plaintiff if Plaintiff failed to pay the alleged debt, Plaintiff acted in clear violation of 15 U.S.C. 1692(f), Fields v. Wilber Law Firm, USCA-02-C-0072, Circuit Court, Sept 2, 2004B.

**SEVENTH CAUSE OF ACTION**

1

**Negligent misrepresentation**

2  **Against all Defendants**

3

4      165. All of the above Paragraphs of this complaint are hereby incorporated by reference

5  as though fully set forth herein.

6      166. Defendant, on Thursday, May 31, 2012 caused to be sent to Plaintiff, through the

7

8  United States Mail, a letter demanding that Plaintiff pay United States Money in the amount of $

9  216,000. The letter was in the form of a monthly payment. Defendant acted to mis-lead Plaintiff

10  into believing that Plaintiff was under obligation to forfeit Plaintiff's personal property to

11  Defendant in the form of money of the United States. Defendant made the above referenced

12  demand on Plaintiff under the guise of being a debt collector, attempting to collect a debt.

13      167. The Defendants made a false-representations to Plaintiff demanding payment on a

14  debt. Defendant knew, or should have known that said demand was made without standing or

15

16  capacity on the part of Defendants. Defendants intended that Plaintiff accept the representation

17  of Defendants as true. Plaintiff believed Defendants were harmed thereby.

18  Defendant, by falsely demanding payment from Plaintiff when Defendant lacked standing and/or

19  capacity to make such demand was an act of criminal fraud and/or negligence which results in

20  the civil tort alleged here under the cause of action of common law fraud and/or negligence or

21  fraud and/or negligence per se.

22

23

24

25                      RELIEF REQUESTED

26

27

28

Complaint For Civil RICO                    59

168. I ask for restoration of the title of the subject residential property into my name, I ask for cancellation of the instruments identified previously, especially the Assignments of Deed of Trust document and the Substitution of Trustee document that are defective for reasons previously discussed. I ask for treble damages for any overbilling and excessive charges based upon what can be learned in the discover process and exemplary damages in the amount of $80,000.00 Silver one ounce coins minted in the United States of America by the US treasury. We ask for such other relief as the court may direct.

Dated _December 14, 2016_

Signed _Dale Young_

Dale Young

**VERIFICATION**

I have read the **Complaint For Civil Rico Title 18 § 1962(a),1962(c), 1962(d)**

Complaint For Civil RICO

and know the contents thereof to be true; and the same is true of my own knowledge, except to the matters, which are therein stated on my information and belief, and as to those matters, I believe them to be true.  The foregoing is true, correct, complete and not misleading to the best of my knowledge. Sealed by the voluntary act of our own hand on this ___*December 14, 2016*___ (date).


Dale Young